JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.S., by and through his Guardian Ad Litem, ASHLEY SANCHEZ,<br><br>Plaintiff,<br><br>v.<br><br>LONG BEACH UNIFIED SCHOOL DISTRICT,<br><br>Defendant. | Case No. 2:25-cv-01121-HDV-PD<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING COURT'S ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE[16]** |

1

## I.      INTRODUCTION

This action is a direct appeal brought by student A.S. ("A.S." or "Student") by and through his mother and Guardian Ad Litem Ashley Sanchez ("Parent" or collectively, "Plaintiff"), against Defendant Long Beach Unified School District ("District" or "Defendant").  Plaintiff seeks reversal of the January 30, 2025 Decision and Order issued by the California Office of Administrative Hearings ("OAH") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA").  Plaintiff filed a Complaint to initiate his appeal on February 11, 2025, [Dkt. 6], and a First Amended Complaint ("FAC") on April 3, 2025 [Dkt. 16].

While this action is functionally an appeal of the underlying administrative decision, it may be viewed as a trial based on the administrative record.  *Compare Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993) (IDEA claim review is "essentially . . . a bench trial based on the stipulated record"), *with Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995) (review is "in substance an appeal from an administrative determination").  Accordingly, the following constitutes the Court's Findings of Fact and Conclusions of Law.[1]  Fed. R. Civ. P. 52(a).

Upon consideration of the parties' briefs, the extensive Administrative Record, ("AR" Vols. I–IV [*See* Dkt. 23]), Plaintiff's supplemental evidence, (Sanchez Decl., Exs. 1-3 [*See* Dkts. 39, 52]), and the oral argument at the bench trial, the Decision of the Administrative Law Judge (the "ALJ Decision") is affirmed for the reasons discussed below.[2]

---

[1] The Court elects to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions, which aids appellate review.  Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.  *Juan Pollo Franchising, Inc. v. B&K Pollo Enters., Inc.*, 2015 WL 10695881, at *1 n.1 (C.D. Cal. Aug. 6, 2015); *see also Vance v. Am. Haw. Cruises Inc.*, 789 F.3d 790, 792 (9th Cir. 1986) (holding Rule 52(a)'s purpose is "achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions").

[2] The ALJ Decision is at pages 781–839 of Volume II of the Administrative Record.

## II.     FINDINGS OF FACT & CONCLUSIONS OF LAW

### A.     Student's Background

At the time of the administrative hearing, A.S. was a seven-year-old boy in second grade, who lived in and attended school in the District.  ALJ Decision at 3; AR at 783; OB at 7.[3]  A.S. was eligible for special education as a child diagnosed with autism and, secondarily, speech or language impairment.  *Id.*  A.S. was therefore entitled to an individualized education plan ("IEP") to be provided by the District pursuant to the IDEA and under California law.  *Id.*

At the start of the school year in 2023-2024, A.S. attended a general education classroom with a full-day, one-to-one behavior aide.  ALJ Decision at 3.  The role of the behavior aide was to address A.S.'s behaviors including elopement, aggression, and tantrums, and to implement goals in peer interaction, functional communication, name response, compliance with directives,  and task completion.  *Id.*  In addition to the behavior aide, A.S. also had several accommodations which addressed behavior, attention, sensory needs, and academics.  *Id.*  A.S. received speech and language therapy as well as occupational therapy.  *Id.* at 4.

### B.     Procedural History

On September 25, 2023 and October 23, 2023, District held A.S.'s annual IEP, and on May 28, 2024, held an amendment meeting to review independent educational evaluations.  ALJ Decision at 4.  The "2023 Annual IEP" collectively refers to both the annual IEP and the amendment.  *Id.*

On August 9, 2024, the OAH received a due process request from District naming A.S.  *Id.* at 1.  The District's request was for a determination by the OAH that the 2023 Annual IEP offered A.S. a free appropriate public education ("FAPE").  *Id.* at 4.  On August 26, 2024, OAH granted District's motion to continue.  *Id.*

Administrative Law Judge Cole Dalton conducted the due process hearing on November 13, 2024, and December 3, 4, 5, 10, 11, and 12, 2024 (the "Hearing").  *Id.* at 1.  Pursuant to the request of the parties, the matter was continued to January 10, 2025, for the submission of closing briefs.  *Id.*

---

[3] All record citations reflect CM/ECF pagination.

at 2.  The matter was deemed submitted on January 10, 2025.  *Id.*  ALJ Dalton issued her decision on January 30, 2025.

In her decision, ALJ Dalton clarified and restated the issue District raised in its due process complaint as follows:

> Did District offer Student a FAPE in the September 25, 2023 IEP, as amended on
> May 28, 2024, such that it may implement the IEP without Parents' consent?

*Id.* at 4.  ALJ Dalton found in favor of District on this issue.

Plaintiff seeks reversal of the OAH administrative Decision and Order finding that District's September 23, 2023 and May 28, 2024 IEP offered A.S. a FAPE, and seeks reasonable attorney's fees and costs for the underlying OAH due process matter and for prosecution of the appeal of the OAH matter.  FAC at 36.

On January 6, 2026, Plaintiff filed his Opening Brief ("OB," Dkt. 43), on February 13, 2026 the District filed its Response ("Response," Dkt. 47), and on February 27, 2025, Plaintiff filed his Reply Brief ("RB," Dkt. 49).  On December 22, 2025, Plaintiff filed a motion to supplement the administrative record, [Dkt. 39], which the Court granted on March 30, 2026.  [Dkt. 52].  Plaintiff supplemented the record with information provided at A.S.'s IEP meeting dated December 3, 2025.  *See* Declaration of Ashley Sanchez, Exs. 1–3 [Dkt. 39-1].[4]  The Court held a bench trial on April 22, 2016 and deemed the matter submitted.  [Dkt. 54].

### C.   Standard of Review

The IDEA guarantees a free appropriate public education to children with disabilities.  *Doug C. v. Haw. Dept. of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013).  The IDEA defines a FAPE as:

> [S]pecial education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school,

---

[4] The supplemental information includes: (1) a "Re-Evaluation Behavior Report" dated December 3, 2025; (2) an IEP Amendment dated December 5, 2025; and (3) a signed IEP Amendment dated December 5, 2025.  *See* Sanchez Decl. Exs. 1–3 [Dkts. 39-1–39-4].

or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  "The IDEA ensures that 'all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'"  *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010) (quoting 20 U.S.C. § 1400(d)(1)(A)).  "To accomplish this goal, the statute 'provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures.'"  *Cnty. of San Diego v. Cal. Special Educ. Hearing Off.*, 93 F.3d 1458, 1461–62 (9th Cir. 1996) (quoting *Ojai*, 4 F.3 at 1469).

Under the IDEA, a party may challenge an adverse decision obtained through a due process hearing in a civil action.  *See* 20 U.S.C. § 1415(i)(2)(A).  In such an action challenging an administrative decision, the IDEA provides "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  *Ojai*, 4 F.3d at 1471 (citing 20 U.S.C. § 1415(i)(2)(C)).

"Judicial review in IDEA cases 'differs substantially from judicial review of other agency actions, in which courts are generally confined to the administrative record and are held to a highly deferential standard of review.'"  *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017) (citing *Ojai*, 4 F.3d at 1471).  However, "[t]he fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982).  "The level of deference the Court should provide the ALJ's decision 'is a matter of discretion of the courts.'"  *N.G. v. ABC Unified Sch. Dist.*, 2014 WL 4678967, at *3 (C.D. Cal. Sept. 19, 2014), *aff'd*, 670 F. App'x 540 (9th Cir. 2016).  "The court gives particular deference where the hearing officer's administrative findings are 'thorough and careful.'"  *R.B. v. Napa Valley Unified*

*Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007).  A decision is thorough and careful "when the officer participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions."  *Id.* at 942.

Here, ALJ Dalton conducted a hearing that took place over seven days and participated in the questioning of witnesses where at least ten individuals testified.  ALJ Decision at 1; AR Vol. II at 781.  ALJ Dalton issued a fifty-nine-page opinion in which she recited the relevant legal standards governing IDEA claims, analyzed the issues and arguments presented, and supported her conclusions with factual findings from the record.  *See generally id*.  Accordingly, the ALJ Decision deserves particular deference.  *See R.B.*, 496 F.3d at 942.

The party challenging the administrative decision to enforce their IDEA rights in federal court bears the burden of persuasion on each claim.  *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir. 2007).  Plaintiff challenges the decision here and thus bears this burden.

> **D.    Issue: Did Long Beach Offer Student a FAPE in the September 25, 2023 IEP, as Amended on May 28, 2024, such that it may implement the IEP without Parents' Consent?**

The ALJ considered one issue: namely, whether the District offered Student a FAPE through its September 25, 2023 IEP, as amended on May 28, 2024.  ALJ Decision at 2, 4.  Although A.S. contested various aspects of the 2023 Annual IEP at the Hearing, the crux of the dispute involved District's recommendation that his placement be changed from general education to a collaborative co-teaching classroom ("CCT"), which is taught by both a special and general education teacher.  *Id.* at 4.  A.S. contended that he should remain in general education as the least restrictive environment, and that by remaining in the general education classroom with typically developing peers, he would be able to continue developing socially and academically.  *Id.* at 5.  District maintained that by recommending that A.S. be placed in the CCT program, it offered him a FAPE in the least restrictive environment.  *Id.*  According to District, CCT was less restrictive than a resource specialist program in either a push-in or pull-out model, and A.S. would benefit from the specialized academic instruction provided by working in his regular classroom along with typically developing peers in whole group, small groups, and individually.  *Id.*  In addition to the ALJ's considerable analysis of

this issue, the ALJ also examined Plaintiff's claims of improper notice of the initial complaint and pre-hearing conferences. *See, e.g., id.* at 52–57, 6–11. After a thorough review, the ALJ ultimately determined that the District did offer Student a FAPE through its September, 25, 2023 IEP and that it could be implemented without Parents' consent. *Id.* at 58.

In the present appeal, Plaintiff asserts that he was denied due process and a FAPE in the underlying OAH due process matter. OB at 11. Specifically, Plaintiff contends that due process considerations, including his rights "to service of the actual complaint and to service and notice of the several pre-hearing conferences" warrant a reversal of the ALJ Decision. OB at 7. Plaintiff claims that OAH failed to properly serve the complaint, as it was sent via FedEx, and failed to provide proper notice of three pre-hearing conferences which were sent via electronic service. OB at 12–13.

The IDEA provides that a procedural violation results in the denial of a FAPE when it (1) impedes the student's right to a FAPE, (2) significantly impedes the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE, or (3) causes a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii). Bason on a review of the ALJ's Decision and the underlying evidence, the Court finds no procedural violations under this standard.

First, Plaintiff avers that the District's initial complaint was not properly served as it was sent via FedEx which "is not a mail but a delivery service." *Id.* at 12. Plaintiff maintains that the ALJ incorrectly found that FedEx was a "proper method of service." *Id.* (citing AR at 887:2-6). The Court is not persuaded. Here, the ALJ reasoned that proper service may be by mail, which includes overnight mail or some other mail delivery service. *See* AR at 886:11-16 (citing Cal. Code Civ. Pro § 1013). Moreover, in support of this finding, the ALJ determined that the evidence showed a photograph of the FedEx package with the due process complaint sitting on the Plaintiff's porch. AR at 893:4-5. The ALJ correctly found that the complaint had been properly served.

Next, Plaintiff contends that he did not receive notice of the OAH pre-hearing conferences ("PHCs"). OB at 13. The ALJ reviewed this contention and found that each of the OAH documents were properly served via overnight mail and had proofs of service, and were also sent via email. AR

at 887:7-21.  The ALJ noted that although duplicative email service was not required, it was done as an added level of assurance.  *Id.* at 887:22-888:1.

To assess this issue, this Court ordered District to submit supplemental briefing including the proofs of service for the PHCs.  [Dkt. 54].  In its briefing, [Dkt. 55], District cited to the AR with the proofs of service showing that Plaintiff's mother was served via overnight delivery and email for the PHCs.  *See* AR 47-48, AR66-69, AR 87-88.  The Court has reviewed the proofs of service and finds that service was made via overnight delivery and email for the first two hearings, AR 47-48, AR 66-69, and via overnight delivery for the third hearing.[5]  AR 87-88.  Thus, as email service is not required, the Court finds sufficiency of service as to all three pre-hearing conferences.

The Court therefore concludes that OAH provided proper service and notice to Plaintiff as to the District's initial complaint and all pre-hearing conferences.  Therefore, the Court affirms the ALJ determination that no procedural violation resulted in the denial of a FAPE, as Plaintiff was provided with adequate notice and the opportunity to participate in the decision-making process regarding the provision of the FAPE.  *See* 20 U.S.C. § 1415(f)(3)(E)(ii).

Plaintiff also seeks to overturn the ALJ's Decision on the merits and contends that it was incorrectly decided.  The Court disagrees.  In determining appropriate IEP services, the IEP team must determine the Least Restrictive Environment ("LRE") for the student.  LRE is defined by the IDEA as follows:

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aides and services cannot be achieved satisfactorily.

---

[5] The first PHC was scheduled for August 26, 2024 at 1:00 p.m. via videoconference.  AR 7-8.  The proof of service was served on Plaintiff on August 13, 2024, via both overnight delivery and email.  AR 47-48.  Instructions for accessing Zoom were also provided, along with notice that the PHC could also be joined via telephone.  AR 34-36.  The second PHC was set for October 11, 2024 and served on August 27, 2024 via email and overnight delivery.  AR 63, 66-69.  The third PHC was set for October 28, 2024 and served on October 15, 2024 via overnight delivery.  AR 85, 87-88.

20 U.S.C. § 1412(a)(5)(A).

The Ninth Circuit articulates a four-factor balancing test to determine the appropriate LRE for a child with disabilities: (1) the educational benefits of full-time placement in a regular classroom; (2) the non-academic benefits of full-time placement in a regular classroom; (3) the effect the presence of the child with a disability has on the teacher and children in the regular classroom; and (4) the costs of placing the child with a disability in a regular full-time classroom. *Sacramento City Unified School Dist. v. Rachel H. ("Rachel H.")*, 14 F.3d 1398, 1404 (9th Cir. 1994).

As to the first Rachel H factor, Plaintiff argues that, as of the fall of 2023, A.S. was making some educational progress on his IEP goals, including academic and behavioral. OB at 8–9. Plaintiff contends that, even though he was working well below the level of his classmates, this marginal progress satisfies the "educational benefit" component of LRE. OB at 19. Plaintiff further avers that A.S. was receiving both educational and non-educational benefits in his general education classroom. *Id.* at 9.

The ALJ, however, determined that from the evidence presented that "Student made limited academic progress in his first-grade class, causing a widening of the gap between him and his typically developing peers." ALJ Decision at 53; AR at 833. Specifically, A.S. knew fewer than ten letters of the alphabet, could only write his first name, and could not make any letter sounds, while the other children were reading, writing informative text, and solving math problems. *Id.* By the time of A.S.'s September and October 2023 annual IEP team meetings, the ALJ found that he had made zero to fifty-percent progress on academic readiness goals, despite receiving substantial support from his teacher, volunteer, and behavior aide. *Id.* The ALJ further found that annual progress reports showed that A.S. continued to struggle with copying numbers and letters into the 2024-2025 school year, and that he "required crucial instruction in basic academic areas of reading, writing and math to make appropriate educational progress." *Id.* As a result, the ALJ concluded that the Student's academic progress weighed, at a minimum, in favor of placement in the collaborative co-teaching program. *Id.* at 54.

The Court's review of the Administrative Record supports the ALJ's findings. Ms. Jeanette Luzzi, A.S.'s first grade teacher, corroborated the ALJ's determination that A.S. did not make

adequate academic improvement during his first grade year as he did not meet any of the goals she had given for him.  Volume IV AR at 1883, December 12, 2024 Luzzi Testimony 163:7-16.  In addition, Mr. Richard Furbush, a Licensed Occupational Therapist, testified that A.S. had difficulty following directions and initiating and completing tasks with multiple steps, despite having significant adult assistance.  *Id.* AR at 1956, December 12, 2024, Furbush Testimony 41:14–21.

Further, an evaluation conducted by Helena Johnson, Ph.D., a licensed clinical psychologist, provided that, according to her interview with his teacher, "if [A.S.] does the work, he is just guessing, and that everything in the curriculum is too high for him."  Volume I AR at 347, Ex. S6, December 7, 2023 Evaluation.  This evaluation also stated that if the teacher worked with A.S. "for a half hour, one-to-one, he can understand the information (e.g., counting) but he forgets what he learns and has no recognition of it the next day," and that, "he needs modification of everything and then still needs one-to-one instruction even with the modification."  *Id.*

Lastly, Mr. Ari Langman, a special education and resource specialist teacher, testified at the Hearing that A.S. made "minimal progress" from the 2022 to 2023 school year, that he was able to recognize 15 letters in 2022 and 18 letters in 2023, and that "a student in the general ed curriculum should absolutely have known all of the uppercase and lowercase letters at that time and should definitely have learned more than three additional letters in the course of a year."  Volume IV AR at 1327, December 12, 2024 Langman Testimony 191:1–17.  Mr. Langmann further testified that A.S. had made "very little progress" in math from 2022 to 2023, from being able to identify numbers one through ten, excepting nine, to only learning to count two additional numbers over the course of an entire year, and that "[b]y first grade, a student should be able to count to 100."  *Id.* at 191:18 to 192:17.

Accordingly, the ALJ correctly determined that the first factor of educational or academic benefit weighs against placement in a general education setting.  *See Endrew F. v. Douglas County School Dist. RE-1*, 580 U.S. 386, 402–403 (2017) (holding that more than *de minimus* progress is required to satisfy educational benefit under IDEA).

Next, as to the second factor under *Rachel H.*, the ALJ found that A.S. did not derive meaningful non-academic benefit from his general education classroom as he failed to "significantly

develop communication, social skills, or improved self-confidence." ALJ Decision at 54. While the ALJ acknowledged that Student "did make some progress" in terms of non-academic benefit, the ALJ determined that, despite this, "inclusion in the fully integrated collaborative co-teaching program would provide Student with greater opportunities to engage with typically developing peers." ALJ Decision at 54. Moreover, the ALJ reasoned that working in the small groups with his peers as provided for in a CCT setting "would provide more opportunities to engage in appropriate communication, work on turn taking, respond to his name, and develop social interactions and friendships." *Id.* at 54–55. Therefore, the ALJ concluded that this factor weighed in favor of placing A.S. in a collaborative co-teaching program. *Id.* at 55. Having reviewed the administrative record, the Court agrees with the ALJ's conclusion that the evidence did not demonstrate that placement in a general education classroom provided A.S. a meaningful non-academic benefit.[6]

The third *Rachel H.* factor is the central issue in this appeal: whether the evidence supports the ALJ's finding that A.S. engaged in behavior that negatively impacted his own learning and the learning of others,. Plaintiff contends that, "contrary to testimony from district staff at hearing, A.S.'s behavior had improved and did not prevent him from remaining in a general education classroom." OB at 21. Plaintiff further contends that the evidence offered at the hearing "supported the fact that A.S.'s behaviors could be addresses in his general education classroom." OB at 22

---

[6] Heidi Hardy, A.S.'s case manager and speech and language pathologist, testified to observing A.S. in Ms. Luzzi's classroom in September and October of 2023. She stated that she did not observe A.S. interacting with any of his peers and that he was "mostly sitting at his desk and not communicating." AR 1208:21 to 1209:9. According to his teacher Ms. Luzzi, A.S. would get frustrated with other children because "he didn't understand their meaning behind things. Like if someone tapped him on the shoulder, he didn't understand that tapping on the shoulder was just to get his attention." AR 1826:19 to 1827:8. Ms. Hardy testified that, as part of A.S.'s September or October 2023 IEP, she developed "a goal for pragmatics" to improve his communication skills because, as she stated, the "ability to communicate with peers . . . it's very important in a social skill for a child." AR 1224:1–5, 1224:19–25. Specifically, she stated that she developed this goal because A.S. "had limited interaction with peers and adults and wasn't able to maintain the topic of conversation with somebody for two turns, so he needed to increase the number of turns he was able to do in communicating with peers and adults." AR 1224:6–11. Ms. Hardy further stated that she believed the CCT class would benefit A.S.'s communication skills because having an extra teacher "could help facilitate that communication" by "promoting an interaction between two students on a topic." AR 1225:1 to 1226:5.

citing AR 1790:25 to 1791:2.  In support of this contention, Plaintiff cites to the testimony of behaviorist Marilyn Grajeda, hired by the District, who testified that Student's behavior was improving and that she was unaware of any removal of Student from his classroom due to his behavior.  *Id.* citing AR 1749:4–6, 1792:22 to 1793:7.  Plaintiff also states that records were not created documenting the removal of A.S. from the classroom or the removal of his classmates due to his behavior, thus indicating a "lack of severity of A.S.'s behaviors."  OB at 18–19.

Plaintiff's position is inconsistent with the evidence offered at the Hearing.  Specifically, the ALJ found that "Student engaged in tantrum behaviors five to six times during the school year, which lasted for approximately 35-minutes," and that "[d]uring these tantrums, either Student or his classmates had to be removed from class."  ALJ Decision at 55.  The ALJ further found that, "[s]ome children feared being around Student because of his aggressive behaviors of hitting and pushing when he did not get what he wanted."  *Id.*

The ALJ's findings are supported by the evidentiary record.  The record shows that A.S. repeatedly engaged in tantrums and other behaviors that disrupted his own learning and the learning of others.  For example, A.S.'s first grade teacher, Ms. Luzzi, testified that if another student sat on the red square of the rug during floor time activities, A.S. "would either push them off or hit them so that he could sit on that red square."  Volume IV AR at 1827, December 12, 2024 Luzzi Testimony 107:9–12.  Ms. Luzzi further testified that, if other students stood first in line, A.S. "would tend to push them out of the way so that he could be in the front."  *Id.* at 107:18-19.  As a result of this behavior, Ms. Luzzi stated that other students were afraid of A.S.  *Id.* at 107:21–108:8 ("Some of the girls at the beginning of the year were afraid of him because he would push them out of the way.").

In terms of tantrum behavior, Ms. Luzzi testified that A.S.'s tantrums were particularly egregious during the beginning of the year in September and October of 2023, and at least twice a week the rest of the class had to leave the classroom because of the disruptions by A.S.  *Id.* at 109:17–25.  Ms. Luzzi explained that:

> He threw tantrums where the classroom was just - - he would disrupt the classroom.
> And so his aide, when the aide was able to, would take him out of the classroom.
> But sometimes he wouldn't - - we couldn't convince him to leave the classroom,
> and so I would have to have the rest of the class leave instead.

*Id.* at 108:12–18.  Ms. Luzzi also stated that there were occasions when A.S. pushed, kicked, or punched her.  She stated, "[t]here were a few times where he would push me or kick me or punch me when I was trying to get him from hurting someone else."  Id. at 108:19–21.

Ms. Lucci testified that she had 30 students in her class in the 2023-2024 school year and that she was the only adult in the classroom paid by the District.  *Id.* at 112:16–22.  She explained that the time she spent redirecting A.S. or addressing A.S.'s behavior impacted her time with other students.  *See id.* at 111:1–11.  She explained, "I hate to say this but it did take away from the learning of the (inaudible) students because I wasn't able to pull other students because I was working with (A.S.) on things that he needed."  *Id.* at 111:4–7.  According to Ms. Lucci, A.S. received about an hour of individual learning time from her per day that took away from other students, plus an additional hour to an hour and a half of time from the classroom volunteer.  *Id.* at 101:21–25.

In addition to negatively impacting the learning of other students, Ms. Lucci stated that A.S.'s behaviors impeded his own learning as well.  *See id.* at 117:1–10.  As a result, Ms. Lucci, an elementary school teacher for over thirty years, agreed with the IEP team recommendation that A.S. be placed in a CCT setting.  *Id.* at 121:1-10, 140:8-16 ("I felt that a special education teacher would be able to know better than I did how to help him with, for example, even - - the five letters a week, if that was good enough. . . . I truly do feel that a special education teacher would be much more knowledgeable than me on helping him with his needs.").

The Court finds this evidence to be persuasive and further finds that it supports the ALJ's determination that A.S.'s behaviors had a negative impact on the teacher and children in the regular classroom, thus weighing in favor of the ALJ's decision that a CCT placement was the LRE for A.S.

As neither party provided evidence of the costs associated with placement, the ALJ correctly found this fourth *Rachel H.* factor to be moot.  *See* ALJ Decision at 56.

In sum, upon consideration of all the *Rachel H.* factors, the Court concludes that the negative effect the presence of A.S. had on the teacher and children in the regular classroom, combined with the minimal educational and non-academic benefit A.S. received in the general education classroom, supports the Decision reached by the ALJ.  The Court thus affirms the ALJ Decision on its merits.

Finally, Plaintiff contends that the District failed to comply with California law because the District's written offer of FAPE failed to identify the specific school site where the CCT would be located. OB at 19. The September 25, 2023 IEP provided:

> In considering location of service, the LRE placement for students will be at their school of residence. If the student's school of residence does not offer the program/services needed as determined by this IEP, or if there is no space available in the program at the school of residence, the program/services will be provided at the closest school to the school of residence that has the required program/services and space availability.

AR at 462. In response to a request for clarification of the school site location filed by Plaintiff, the ALJ stated:

> At the time of the October 2023 IEP, Long Beach offered the program at Riley Elementary School, the school closest to Student's home school, with an opening in the collaborative coteaching program. As the evidence demonstrated, and as the Decision relates, Long Beach offered placement in the collaborative co-teaching program at the school site closest to Student's home school that has an opening. Accordingly, the Decision requires Long Beach to offer Student placement in the collaborative co-teaching program, closest to Student's homeschool, which currently has an opening.

AR at 323.

An offer of FAPE by a school district must include the "location" of the educational placement which refers to the "type of environment that is the appropriate place for provision of [a special education] service" and does not require that a particular school be identified. *Rachel H. v. Department of Education Hawaii*, 868 F.3d 1085, 1090–1092 (9th Cir. 2017) ("[W]e hold an educational agency does not commit a per se violation of the IDEA by not specifying the anticipated school where special education services will be delivered within a child's IEP."). No violation of that provision occurred here. The ALJ therefore correctly decided that the District provided a sufficient offer of FAPE.

14

**III.    CONCLUSION**

For the reasons set forth above, the ALJ Decision is affirmed.  This order constitutes notice of entry of judgment pursuant to Federal Rule of Civil Procedure 58.  Pursuant to Local Rule 58-6, the Court orders the Clerk to treat this order, and its entry on the docket, as an entry of judgment.

Dated: July 8, 2026

_____

Hernán D. Vera
United States District Judge

15